Good morning, Your Honor. My name is Kelly Dudley, and I represent the homeowners, who were the plaintiffs below, and who are the appellants. Thank you. Good morning, Your Honor. My name is Jerome Weiner, and I'm here with Bernard Citrin, and we represent the appellees, the defendants in this matter. Okay. We have read your briefs. I would suggest you state to what points you think are your strongest, and we will question you on what we think is important. Okay, let's proceed. About 20 minutes total? Fifteen to five? I am prepared to go up to 20 minutes, Your Honor, but we can certainly strike some material. Unless you go on and on, we usually don't cut you off. Okay. I'm accused of going on and on. We'll stop you. Thanks, and I'll be fine. Thank you very much, Your Honor. Proceed. May it please the Court, my name is Kelly Dudley, and I represent the homeowners in this case. This case is about honoring an agreement. The homeowners, who are the plaintiffs in this case, and the defendant, a developer planning to construct a mixed-use commercial and residential building, all own property subject to an agreement. The agreement is part of the deeds and the plan of the subdivision, and the defendant knew about it when he bought the property with the assistance of a lawyer. Defendant's development would violate the agreement, which the homeowners seek to enforce. The plaintiffs and defendants all own property within the same subdivision. Properties within that subdivision are subject to an agreement, in this case, a restrictive covenant. The restrictive covenant is recorded in the plan of subdivision, individual deeds, and other documents recorded in the chain of title to the subdivision. Defendant's title search located the restrictive covenant, and defendant was aware of the covenant when he purchased the property. The covenant designates certain properties within the subdivision as residential and others as commercial. The residential and commercial areas of the subdivision are distinct, and in all cases, they are separated by public alleyways. The covenant also requires that buildings on residential properties be set back at least 20 feet from the property line, with certain exceptions for bay windows and porches. They can go up as close to 10 feet from the property line. Well, Ms. Dudley, isn't it? Excuse me, counsel. Go ahead. Were there public hearings on this matter? There were, Your Honor, and those public hearings involved zoning. They did not involve the private matter of a restrictive covenant. So did your clients participate in the public hearing? Some of the clients did go to public hearings, Your Honor. There were depositions at which they were asked if they went to public hearings. They did. Some of them go to public hearings and talk about having to put their name on a sheet to talk and things like that. And in addition, Mr. Brewer, who is someone who lives near the subdivision and knows many of the homeowners, wrote letters that are part of the record, advising that he believed that the development was improper for several reasons. What is your response to the fact that many of the properties in that area had already violated the restrictive covenants throughout the years? Actually, Your Honor, I really appreciate that question because it is important. The subdivision was developed in the 1910s and 20s. So to look back to what they meant in the 1910s and 20s, we would have to look back to what they considered to be a porch or a bay window in those days. The burden under several lines of case law for saying that waiver has taken place, including the Hanna case and the Tones case, is placed upon the person asserting that waiver has taken place. The defendants here never did that. They never showed us how or why these alleged projections were not within the definition of bay windows and porches as they existed at the time the subdivision was developed and settled. What evidence was there that the proposed building was going to be violative of the covenants? That seems to be where the trial court found the problem was, that you felt you had met your burden below as to say how this was going to be violent. Well, we were able to offer witness testimonies of people looking at plans that were posted publicly and offered and filed with the City of Chicago during the zoning process and things like that. And in addition, Your Honor, we're not required to show exactly what was in the mind of the defendant. No person can ever show what's in the mind of another person, and the court often has to make tough calls there. Fortunately, the court has already done that for us. In a second district case from 1985, which we cite extensively in our brief, Amico Realty v. Montalbano, there was a case where someone proposed to build a building that violated a restrictive covenant. The restrictive covenant said, one, that there couldn't be commercial uses, and two, that light posts had to be limited to a certain type. Well, the builder wanted to build a building that would have some commercial use in it, and they were also going to put in light posts that violated that covenant. About halfway through the litigation, the builder said, okay, we changed our minds, we'll make this building strictly residential, we won't put in the light posts, and they moved to dismiss the case on the basis that it had been mooted. In fact, the court held, no, it hasn't been mooted, you could still go back and you could build something that violates the restrictive covenant. So although it's my contention that we did prove that this building was going to violate the restrictive covenant because it would not only not have a setback, but overlap the sidewalk significantly. So there was a less than zero setback. And then in addition, there were going to be commercial uses, even though we did put some of that kind of evidence into the record. At the same time, I think that we could have prevailed properly if we had not put a single iota of evidence into the record. Well, apparently you were mistaken on that because you lost. So I would indicate, so the trial court had a difference of opinion and they called the shots. Right. Going to Amoco, though, that involves the Midwest Club, which was apparently run, there's a control committee it refers to in the opinion, which administered the architectural and landscaping controls and everything was done very professionally. And there were four variances that apparently the Montalbanos referred to. So they did four things we didn't like. I suggest it's dramatically different than the several block area we were talking about, which is classically in the city of Chicago. Nobody's running it. Everybody has their own homes. They do what they want with their homes. They can paint them purple, put up fences, don't put up fences, whatever they wish. So while Amoco does stand for the proposition you asserted, I suggest it's radically different on its facts. Am I correct in saying from the briefs that until this first, what is the status of this building now, the development? I believe the building has largely been constructed, Your Honor. Until this building was built, was there any other commercial, any other property on Rockwell Street used for commercial purposes other than the city's parking lot? I don't believe there was, Your Honor. And we have pointed out consistently that the city's parking lot was not a building. And the restrictive covenant agreement applies to buildings, Your Honor. And revisiting the Amoco case, you make a very good point that it is different and it is wonderful in some cases. In some cases I believe it's misused for a bad purpose. But sometimes it's wonderful when we have these planning committees and things and they tell us exactly what we can and cannot do. Of course, people relying on covenants from a long time ago don't have that kind of committee. But you say this is a classic Chicago neighborhood, and that's one of the points. These are classic Chicago-style bungalows in one of the most beautiful neighborhoods in Chicago. I don't think I can put most beautiful neighborhood on the record, but this is a wonderful historical neighborhood. So has the character of the neighborhood changed since 1913? It has not, Your Honor. To go into that neighborhood, it is classic Chicago bungalows that sit side-by-side to each other. So far, and I'm sure the homeowners would knock wood, no one has painted one purple. They get to. I haven't liked it. So to suggest to people like gated communities, I don't want somebody to tell me what kind of light bulb they have or anything like that. They own this property. But that cuts against your position, of course, in this case, because it's not your property. It's their property, their client's property. I'm sorry, Your Honor. No, go ahead. In this case, Your Honor, everyone agreed in two ways to honor this covenant. One, it was on the plat of subdivision, and two, it was in the deeds. How do you agree? They're put on notice. They don't agree whether you buy the house or not buy the house. If you buy the piece of property, you don't buy it. In fact, your title search would indicate, by the way, you have to do these things. This is the law. And then what do they do in reply? They go to the city. For zoning purposes or any other purposes, they have to get building permits and let the city know what they're doing. And that was done here. Is that right? A covenant runs with the land, Your Honor, way back to the Bixby case, which I'm sure you know, are far more eloquent about than I am, so I won't go into it. But it does run with the land. So when I buy a piece of property that's subject to a covenant, I'm seeking to honor that covenant. I'm agreeing to honor that covenant. If I don't want to honor that covenant, I have redress to the courts. I could have that covenant declared unenforceable, which we've done throughout history with horrible covenants, such as racially restrictive covenants. Others of us look at communities that are subject to certain covenants and we choose not to move into them. I myself am a little bit, as you indicated, a free spirit and wouldn't want to live in a gated community. But that's why property is non-fungible and why we have this huge array of choices. The city of Chicago, as much as I love it, does not have the ability to, through its zoning process, alter private agreements between parties. So had this been a situation where the city of Chicago said you can't have an entertainment business here and someone wanted to put an entertainment business there, their recourse would have been to go before the zoning committee, which is what they did in this case. However, in this case, what we're complaining of is that a private agreement, the restrictive covenant, has been violated. And our case hinges on that. Well, they make the point in their brief that really all this is being driven by Mr. Brewer. So it's really not a group of concerned citizens. Mr. Brewer is very unhappy with what's going on at that building site. Was the trial court incorrect in that? Had it not been throughout history for concerned people like Mr. Brewer, we wouldn't have done things like set aside bad restrictive covenants that were based on things like race. We wouldn't have private parties like fair housing clinics, intervening in housing and things like that. So we do have in our society private individuals who get out and talk to people and tell them about their rights.  However, in this case, it is not Brewer versus Siddiqui. We have approximately ten homeowners who came into the case. Some of them indicated an interest in being here today even. They testified at the trial. So this isn't a case of Mr. Brewer thinks that Mr. Siddiqui has done something wrong and has applied to the court for the relief. This is a case where some homeowners have applied to the court for relief. It happens that there's an allegation that Mr. Brewer is the one who brought to their attention that they have legal rights, what he believed were their legal rights. Only the court can decide if they have those legal rights. And you raised the issue that Mr. Brewer's testimony was barred and you felt the issue had not been barred. Yes, Your Honor. But the court indicated that it was not timely disclosed. That's true, Your Honor. Was it timely disclosed? It was, Your Honor. Mr. Brewer was in our witness list and his deposition was taken. He was not, until shortly before the trial, he was not disclosed as an expert witness. However, we believe that defendants could have applied to the court for time to take his deposition. And there are plenty of cases where that has happened. Trials have even been continued so depositions could be taken. And to aggravate the situation here, we were working at all times under an expedited trial schedule that was urged by Mr. Siddiqui because he wanted to know the status and should I or should I not proceed with my building. But what prejudice did you suffer since he was Mr. Brewer's lie to testify? You assumed everything he was to testify to other than he's not called an expert. Mr. Brewer was able to testify, but as an architect he is qualified or we would have proffered that he was qualified to do things like look at a set of architectural plans and say this set of architectural plans means this. It would have done that. He was not able to do that kind of testimony. Instead, he was able to, as a lay witness, look at documents and say what they represented. Well, why would that be different? So if he says, well, in my architectural suit I can tell you that this flat of the floor of this six-story building is going to go six stories high, it's going to have 30 condos, 200 apartments, whatever, as opposed to in my normal run-of-the-mill fellow man-in-the-street, I can tell you that this is a six-story building, it has 50 condos and 200 apartments. Well, that's exactly what he wasn't able to do, Your Honor. He would have been able or we would have asked him to give us testimony that says this is a plan and when this kind of plan is executed it results in this kind of building. He wasn't able to do that. Instead, where we did want his testimony on what would be built, we had to go through something of a rigmarole where he would say I'm looking at a piece of paper and there's a dotted line and the dotted line says so-and-so on it. So you weren't able to call anybody to describe this project? We were not able to call an expert witness, Your Honor, because we had relied on Mr. Brewer as our expert witness. Even an expert witness, why couldn't you call someone from the city to say these are the plans that Mr. Siddiqui has put forward, we approve those plans on this given day and this is what those plans mean? Calling someone from the city, we would have run into the same problem, thinking that we had Mr. Brewer's testimony as we had it, and again on a very expedited schedule, Your Honors, we were not aware until the last minute that Mr. Brewer would not be testifying. So at that point, we would have been disclosing a whole new witness as opposed to simply disclosing Mr. Brewer as an expert witness. If that's not the case, then I'd suggest that it would actually be and our standard view on this in terms of witnesses is abuse of discretion, right? So under that basis, it just happens every day in the courts throughout, people decide on a witness list and they decide they're not going to call someone from the city. And the drawback of not getting an overly inclusive witness list is sometimes when your star witness gets run over by a truck, flips, disappears, the court bars them, you better have somebody else ready to go. But if you do that, then you end up in front of us saying, well, we're Socratic. And then we have to say it's arbitrary. We have to judge arbitrarily. That's a very, I don't know, a very tough word. In this case, Your Honor, we're not saying that the court doesn't have discretion, but we are saying that discretion is not to be used as a form of gamesmanship. And in this case, because everyone knew that we were operating under an accelerated schedule, we didn't have the typical time to prepare our case, and it was a very complex case, we were hurt by having him excluded at the last minute. When you're under an accelerated schedule, you get the people in that you need to and you depose the people that you need to. And the kind of trial tactic that you're suggesting is an excellent one, but our court system is not just open to people who can afford to hire lots and lots of witnesses. It's open to litigants who are working to do their case in the most efficient way. So to place a burden on defendants to prepare for gamesmanship to be had is not really, I think, asking our justice system to do the highest thing it's called to do. But to bring in government witnesses, you need $35 or whatever they charge you for a subpoena. You're not being a practicing lawyer, Frankie, ever. Maybe it's $120, but the government witnesses, you don't pay them, they arrive. Those government witnesses of whom you speak, of course, I can't completely revisit my case and know their credentials right now, but they may have only been qualified to be fact witnesses. And we were able to proceed with Mr. Brewer as a fact witness. Right. Well, wasn't it the problem, according to the trial court's findings, that was a problem? He couldn't tell what was going to be said. I can't tell what's being built there. I can't tell if it's in violation of the setback. I don't know what you're going to build there. One of the things that may have contributed to that perception was that we weren't able to bring in an expert witness and we instead went through considerable hoops to get our testimony in through someone who was characterized as a lay witness. And I think another important thing here when we talk about gamesmanship that was unique in this case is that there was never any close of discovery in this case. So the rules say you have to disclose someone before the close of discovery. I'll acknowledge that I'm a fairly new lawyer and fairly naive and fairly idealistic, but it seems to me that when I read the rules and they say things like that, I think, well, discovery hasn't closed, so it's time for me to bring in my witness list still. If defendant had been that concerned about knowing that discovery was done and that it was set and these were the documents we were going to have and these were the witnesses, they could have moved the court for the close of discovery and they didn't do that. I'm sorry. Did you not have surveys? Did you not have their plans? We did, Your Honor, and we used those, but we only got, we only sponsored them with lay witness testimony. We didn't have someone who came in and said this is, from an architect's perspective, this kind of plan results in this kind of building. And I will point out that through the ---- Those plans, those surveys, would show a violation? Yes, Your Honor. I don't understand that. Why didn't you call the other side? Your Honor, people, we, through our own witnesses, were able, using our lay witnesses, we were able to say this is the building line and it's here. So we were able to get that information into the record. There's always more information one wishes one had gotten into the record. Thank you. Anything else? Thank you, counsel. Thank you, Your Honor. Thank you. May it please the Court. I just need to correct one thing just to begin with. The record will show that there were no surveys, no plans put into evidence by the plaintiffs in this particular matter. That was not done. By way of introduction, Your Honor, and that goes along with what I've just said, plaintiff's case for summary judgment and a trial was based on the claim that because these restrictive covenants existed, they were entitled to enforce them. That's their claim. They state that on page 11 of their brief. In this case, it is uncontroverted that the restrictive covenant existed and that the property was subject to it. Instead of finding that the covenant did not exist or that the defendants did not have notice of the covenant, the trial court based its finding on a mistake of law, that homeowners were required to prove that the development would restrict, would violate the restrictive covenants. However, the homeowners were required to make no such showing before they can enforce a restrictive covenant. I respectfully submit, Judge Judges, that that is not the law. The law is that they were required to show that there was a violation. They were asking for a permanent injunction. The cases are clear on they're cited by both sides, that if there's a request for a permanent injunction, the plaintiff must show that there would be a violation of the restrictive covenant. The cases they cite, the Amco case and the concentrated phosphate case, they deal more with an issue of, well, if someone has violated and has said that they would  And the reason that the Amco case is so efficient is they make it moot. And the court said, well, no, it doesn't make it moot because they can come back and do it again. So those cases don't stand for the proposition that they don't have to show a violation. They have to show a violation. My read of the Amoco case, too, in its facts shows that in addition to operating a business from their home, the Montalbano's constructed four stone square light windows, which were measured four feet high and two feet wide. So they had constructed these alleged violations. And they were in existence at the time that this matter was litigated. Plaintiffs, now with regard to showing a violation, plaintiffs failed at summary judgment and a trial to introduce any document which showed that the project would violate either covenant. Plaintiffs failed at summary judgment and trial to present any document which showed the size of the site, where the building would be located, and where specific uses would take place. For these reasons alone, the trial court properly denied plaintiff's motion for summary judgment and granted defendant's motion for directed finding at the close of plaintiff's case. How big is this building? It is Six stories? Yes. Commercial? There's some commercial. On the first floor? Yes, I believe so. And some of that fronts, actually all of it fronts on Rockwell Street, doesn't it? I believe, I'm not sure. Some may front on Rockwell and some on Devon. Right. Outside of the commercial space that is now as a result of this development on Rockwell, up until that time, there had been no commercial space on Rockwell other than a city parking lot. Is that right? I believe on Rockwell that is correct. There were commercials on Devon, certainly, and on other streets. You argued laches as well, right? Yes. The judge didn't rule on that, but you argued laches. Yet your clients bought the property at 6425 Rockwell in June of 2007, right? Yes, I believe that's correct. And the suit was brought shortly thereafter, was it not? That's correct, but it had gone through the city, all the city hearings, as we referred to, as we referred to. Right. But again, as to the 6425, that was brand new. I believe that was just a portion, yes, of the entire property. Yes. Judge, I do have to emphasize that they did not, as far as witnesses are concerned, they didn't call anyone from the city. They didn't call any other people who would possibly identify a document showing or claiming that there was a violation. They called nothing. And because of that, the trial court promptly ruled on both summary judgment and summary judgment for the directed finding. With regard to the motion for summary judgment, initially I'll note that a denial of a motion for summary judgment is not appealable. We cite the Larson case for that. It's a merger. Where summary judgment is denied and the case proceeds to trial, the order denying summary judgment merges with the judgment entered and is not appealable. That's what happened here. The Larson case is directly on point. That was a case exactly like this. There was a denial of plaintiff's motion for summary judgment. The case proceeded to trial. And then there was a grant of a motion for a directed finding at trial. And the Court said the denial of a motion for summary judgment was not appealable. The one case that plaintiffs cite as an exception in the Lemoyne case deals with a very narrow situation and cites a battle case where there was, they say, if there is a separate and distinct issue on summary judgment that's separate and distinct as to what the trial has, maybe you can do it. But that was a case in which the battles case, there was an accounting issue on summary judgment and there was a breach of fiduciary issue with regard to the trial. So it has nothing to do with the kind of case that we're dealing with. The cases we cite show, in fact, there's definitely a bar. And we read that in your brief. That's true. With regard to summary judgment, then judge, the summary judgment motion failed to show any violation of the covenants. It did not identify any document which showed the project would violate either covenant. Instead, the only thing that they presented was our answers to paragraphs 22 and 23 of the complaint. With regard to those answers, in both of those they made allegations that the plans on Rockwell property require a violation of either the setback or require a violation of the residential provisions. And we responded by denying it. What we responded was the allegations of these paragraphs are legal conclusions and therefore do not require an answer. If any answer is required, these defendants affirmatively deny. We denied it. The same, denied the same because the alleged restrictive covenants are unenforceable. So first we said they're legal conclusions. Then we said we deny them. And then we said, well, they're unenforceable. If they're unenforceable, there can't be any kind of violations because they're unenforceable. So we did, in fact, respond to these. And so that counsel just argued that there was at least one building that went right to the property line and just had some overhang onto the city property. She just argued that. Yes. And I'm not responding to that. There's nothing in the record concerning that. And I'm not so sure what she was referring to. There were no plans put in. There was nothing put in specific about these buildings. So I wish I could respond. Well, isn't that one of the problems with the whole case, frankly, is that you acknowledge this building is there. It's six stories tall. It has commercial space on Rockwell. No other space on Rockwell has a commercial space other than a parking lot. It has 30 single-family condominiums, parking for 215 cars. And that's all true. Now, the question is, was it actually in front of the judge? Because all of those violate, clearly violate the covenant. They completely violate the covenant. The drawback is what was the evidence put on in front of the judge to prove that this is a six-story building, 215 parking spaces, with six residential, six commercial stores on the first floor. It clearly violates the covenant. It's not close. It completely violates the covenant. The question is, we are restricted to the record, and the trial court was restricted to what the plaintiff put into evidence. And you're saying that none of that was put into evidence. Yes, that's exactly right. And that's, I, I, that's that, none of this was put into evidence. Okay. With regard to the motion for summary judgment and with regard to the fact issues, I just want to just point to, in fact, there were surveys. There were matters that were put before the judge in summary judgment and at trial, and those surveys showed that 78 of the 82 properties on two streets violated the 20-foot setback provision. The trial court didn't rely on that in his decision. He just relied on the fact issues. But he didn't say, and by the way, 78 of the 82 properties violated, and therefore, I'm going to find it's not been enforced. He didn't do that. He said, I just find there's not enough evidence of what this new building, the development consists of. That's correct, Your Honor, because it never got that far with regard to the trial court. They didn't make their case in chief, the prima facie case. I just bring it up because we're unlikely also then to find that 78 out of 82 are in effect.  And the trial court did not put any evidence to show that that's not our job. And the trial court didn't say that. The trial court never had to address that with regard to. Right. But the trial court did on summary judgment address that there were fact issues concerning the surveys and there were fact issues concerning the irreparable injury issue. And that's why it went to trial. Right? And that's why it went to trial. One is summary judgment, let's put it to trial, you have to trial. And the trial court properly held at trial that, in fact, they had not proved their case, that, in fact, they hadn't put on any evidence to show. And that's why the trial court stated in its decision with regard to the motion for directive finding, I'll be honest, I'm surprised. I anticipated that either through stipulation or through some witnesses, someone would testify that what the defendant is proposing to be billed would violate these covenants. And I don't have that. In all honesty, I don't have that. And that's the ruling. And it's a proper ruling. Now, with regard to – there are some other issues with regard to arguments that they brought up. I do believe that there were certain arguments brought up in the reply brief that were waived. They were brought up for the first time, but that hasn't been raised and I just take the position that those arguments have been waived. Anything brought up in the reply brief for the first time has been waived. Now, with regard to the other two issues concerning the new trial, the motion for the new trial, and with regard to Mr. Brewer being called as an expert, the record shows, Judge, that the chronology on March the 18th of 2008, defendants issued interrogatories and they included 213Fs. On April 16, 2008, the plaintiffs answered those interrogatories. I beg to differ with counsel for the plaintiff when she said Mr. Brewer was identified. He was not. He was not even identified as a lay witness. He was not identified at all, either as an expert or a lay witness. And how is it you deposed him? We deposed him because he had been so involved in this matter from the very beginning that we felt in order to prepare our case, we would take his deposition on any fact issues that he had. We didn't then. Then after that, on April 22, 2008, the Court ruled that all deaths would have to be completed by May the 13th. They were. We took our final depositions. By May 27, that's the first time. After this was all over, the plaintiffs served what they called a supplemental answer to interrogatories identifying Mr. Brewer as an expert. It wasn't a supplemental answer because it's not a 213I where it's new information that's coming in. Mr. Brewer has been involved in this case from day one. So it certainly wasn't any kind of a supplemental response. Neither was it a surprise, right? It was a surprise when they tried to call him as an expert. He hadn't been identified. When you deposed him, that's what he did for a living? We deposed him as to what he did for a living, but we did not depose him as to all the things you would normally depose someone who was being proffered as an expert. It's testing his opinions, having them in front of you, and doing all the things you would do. Well, tell me, this wouldn't be much of an opinion, right? When he has the plans, he'd say, these are the plans. This indicates this plan that was submitted to the city shows this six-story building is what they're going to build here on the 6400 block of North Rockwell. I don't know if you'd need an expert to say that. Well. It seems to me you do not. But we didn't. We only deposed him as a fact witness. We did not depose him with something in front of us saying this is his intended expert opinion, and then examine him about that. Moreover, I do believe that they waived that because once the trial court ruled that, in fact, that he was going to be excluded, they made no proffer. They did nothing that would, in fact, protect their record before this Court. With regard to the exclusion of documents, by order dated June 12, 2008, the Court ordered exchange of trial exhibits by close of business on June 18, 2008. And the Court ordered that there be any bad exhibits. The parties exchanged exhibits. The document that they've talked about in their briefs and had plans to talk about in their briefs was not included on the exhibit list. They claim that that was an abuse of discretion for the Court then to exclude it, but on the basis that it may have been part of thousands of documents that were delivered during the course of discovery. To follow that argument would put the rule on exhibits, exhibit lists, would make it useless. Parties would always just say I'm going to put something in, anything in, that was delivered and discovered. The witness list's exhibit list is important because it shows the other party the intended exhibits. This document was not on that list, and the Court properly excluded it and had the proper discretion to do so. And finally, Judge, with regard to the show cause, I will yield. I'll just go on my brief on that. I respectfully submit to Your Honors that Your Honors affirm the rulings of the trial court in all respects. Thank you very much, Your Honor. Any questions? Counsel? Thank you, Your Honor. I misspoke when I referred to Mr. Brewer testifying about surveys. He spoke about plans, so I simply used careless language when I was lumping together. Surveys and plans and things like that, certainly as people who aren't attorneys probably lump together interrogatories and depositions and things. What he testified to was looking at a plan and saying, according to this picture that was posted at the site, which I saw at the site and it's now here in the court, there is no setback and there is commercial use. And to get around certain objections, we sometimes had him point at a line and say this was a building line and things like that. We did that with Mr. Brewer, with Ms. Lowman, with Mr. Lowman, who is also an architect, and with Ms. Whitley, who is a party, who is also an architect. None of them were doing expert testimony. We got their knowledge in through a rather clever line of questioning that enabled them to look at a publicly posted document and testify about what they saw. They used their five senses, not their opinions formulated inside their brains as a result of going to architecture school. And I think that on a shoestring and at the last minute, I have to say I think that we did an unusually good job of getting that in and that we were able to show the violations, which is one of the things that this case comes down to. Why didn't you use the surveys? The surveys were objected to because we disclosed them by putting on our exhibit list that we would use as exhibits documents tendered to us by the defendants during discovery. And they objected and the court agreed with them that that wasn't sufficient disclosure. Of course, I return to my point that these things could have been dealt with prior to trial and we could have had a close of discovery, but we were on an expedited discovery schedule at defendants urging at all times. So I think we did a good job with the papers we ended up having in court and the testify, it was just the difference of whether Mr. Brewer got to testify as an expert. Okay. Do you have anything? No. Do you have any points other than that, counsel? We did just want to make the point that the city by its own definitions says that it won't deal with private matters between individuals. Zoning is zoning and private things are private things. And I think my brief well enough addresses why I believe that the doctrine of merger doesn't apply in this case as to our summary judgment. Thank you. Thank you, Your Honor. Thank you.